[No. 22349. Department One. January 16, 1931.]

CARLISLE PACKING COMPANY, *Appellant*, v. PACIFIC AMERICAN FISHERIES *et al., Respondents.*[1]

*Poe, Falknor, Falknor & Emory* and *Walter B. Whitcomb*, for appellants.

*Kerr, McCord & Ivey, W. B. McCord*, and *W. Z. Kerr*, for respondents.

MILLARD, J.—This action was brought to enjoin the defendants from so extending and building their fish trap as to encroach upon a fishing location of the plaintiff. In rendering judgment dismissing the action (no findings of fact were made—none was required, as this is an equitable action), the court stated, in its memorandum opinion, that the location of plaintiff's trap in 1910 was invalid, because in conflict with the senior

[1] Reported in 295 Pac. 155.

location of the defendants; therefore, plaintiff's trap is now illegally located, which precludes enjoining of extension of defendants' location. The court said:

"And if you follow this case of *Womer v. O'Brien* (37 Wash. 9), there isn't any way that the trap, having been located illegally and not in accordance with law, whereby it would ripen into a good location for a trap. You construct your parallelogram and locate it with one of the base lines, beginning at the 61-foot depth and then, of course, there isn't any argument about it but what the jigger and the small part of the hearts fall within the parallelogram of 2400 feet by 600 feet. That being true, I can't possibly see how the trap of the Carlisle Fishing Company was lawfully located in the first instance. It seems to me that in itself disposes of the whole case right there."

The plaintiff has appealed.

The two traps which are the subject-matter of this controversy, are on the west shore of Lummi Island, in the waters of Puget Sound, in Whatcom county, Washington. The appellant's trap is at Village Point and the respondents' trap (the Alsop trap) is east thereof. The fishing tides at this point run from east to west or southeast to northwest; that is, the fish run on a tide that runs from respondents' trap towards the appellant's trap. Respondents' trap was located substantially in its present location in the early nineties, at which time there was no statute requiring the filing, with the county auditor, of notice of location. Then, the traps were located by driving piles and, at each end of the fishing location, a pile was driven, upon which was posted the license number. Having obtained a license for a fish trap, the statute required that the licensee

". . . indicate locations for traps or pound nets made under such license, by driving at least three substantial piles thereon, which must extend not less than

ten feet above the surface of the water at high tide, one of said piles to be driven at each end of the location claimed, and upon said terminal piles there must be posted the license number, and if the locator fails to construct his appliance during the fishing season covered by his license, such location shall be deemed abandoned." Laws of 1897, p. 218, § 7.

In 1905, an act was passed requiring a plat of fish trap locations to be filed in the office of the county auditor and with the commissioner of fisheries. Pursuant to that statute, which, without any change material to the case at bar, is now in force (Sec. 5679, Rem. Comp. Stat.), the respondents, on May 24, 1905, filed their plat covering their trap location. That plat showed respondents intended to construct their trap to a point where the depth of the water was sixty-one feet. In April, 1929, the respondents filed a supplemental notice of location, showing an extension of their trap to a depth of sixty-five feet at low water. The appellant's first trap was located and fished prior to the 1905 enactment providing for filing of notice of location in the county auditor's office. In conformity with the 1905 statute, the appellant filed plat and notice June 7, 1905, covering its first location. The appellant filed notice and plat with the county auditor January 17, 1910, for a second location. A third filing of plat and notice of location was made by the appellant April 22, 1910. We are concerned with only the third location, it being the one with which, it is contended, the extended location of respondents conflicts.

It is appellant's position that the extension of respondents' trap in 1929 is violative of the statute, in that it does not leave an end passageway of six hundred feet between the fishing locations of the respondents and the appellant. Appellant insists that, insofar as the extension is concerned, respondents' location is

not senior to appellants' location; that, prior to appellant's filing of its notice of location and construction of its trap, respondents abandoned their location beyond a depth of fifty-four feet; and that, in extending their trap beyond that point, the respondents are making a new location.

· The relative locations of the two traps in controversy are shown on the diagram below:

Appellant's trap location is shown on the above drawing as lines 5-3-4. Respondents claim that the original location of their trap is indicated by line C-D. They concede that, as far back as 1910, their trap had not been constructed all the way to point D, or a water depth of sixty-one feet, but was constructed to the point marked 54 LW on the line C-D. The respondents now desire to extend their trap five hundred feet; that is, three hundred and fifty feet from point 54 LW

to point 61 LW and an additional one hundred and fifty feet from point 61 LW on line C-E. Respondents argue as follows:

"During the fishing season of 1929 respondents constructed their trap substantially out to the point E on the line C-D-E, that is, to 65 feet at low water. This is the maximum depth to which a trap may be constructed under the statute (Rem. Comp. Stat., § 5672). Prior to 1929, for several years at least, the respondents' trap had not been constructed all the way to the point D along the line C-D on the attached map but approximately to the point marked 54 LW on line C-D. It appears that in 1910, when appellant's present location was filed, respondents' trap was only installed to the point 54 LW. There is, however, no showing whatever that the respondents' trap was not constructed to the point on the line C-D every year prior to 1910, when appellant first filed its location 5-3-4, the present one. In other words, there is no showing whatever upon which a claim of abandonment in 1910 could be based."

Was there an abandonment by respondents of their location beyond point 54 LW? That, with the exception of a few feet beyond that point, respondents never fished subsequently to 1909, is clear. While the plat and notice filed by respondents evinced an intention to fish to a depth of sixty-one feet, it is likewise clear that only for several years following 1899 was the location fished beyond the point indicated as fifty-four feet at low water.

A. R. Campbell, who made a survey August 30, 1909, and prepared the plat to accompany appellant's notice of location, testified that, at that time, respondents' trap was extended only to point 54 LW.

"Well, I have been surveying that trap since 1910 and there has been very little change in it since that time; maybe twenty or thirty feet . . . until this year. It has been about in the same place ever since.

. . . There may be a difference of twenty or thirty feet, but that would be all.''

Appellant's president, who made the location of appellant's trap in 1910, testified that he was familiar with the location of respondents' trap; that it never extended, prior to 1929, beyond point 54 LW, as shown upon the 1909 and 1910 plats, made from actual surveys of the fishing grounds. The witness admitted that, about 1910, the trap may have been fished fifty feet beyond that point. An engineer witness of respondents testified as follows:

''The mark 54 LW shows the point to which the trap has been usually fished in the last few years, to that depth of water. . . . The trap has been fished at variable points. It is true it is extended as much as 350 feet beyond this point indicated by 54 feet at low water. The Alsop trap was originally put in by the Pacific American Fisheries as operators in 1899, but it had been put in in prior years by the Alsop Fisheries. When we put it in, we shoved it out to 61 feet. It was fished in that vicinity at that depth for several years, soon after they began operating. They had more or less trouble, and at that time didn't have the appliances that they have now, and had some difficulty in holding the trap, and they moved back and forth on their lead lines different distances. The first few seasons, they had some trouble holding it. After that, it has been fished between 61 feet depth and 54 feet at different times. We have had different superintendents, and they have undertaken to move it in and out and hold it with different methods, and they varied the distances out. I have been aligning their trap out so far as the alignments were concerned, and they have deviated for years as to the depth they would fish it, depending upon different methods of bracing it. Q. When was the last year that it was fished out beyond the 54 foot, where it was last year? A. I think it has been ten years, or more, since it has been fished out to a much greater depth than 55 or 56 feet. Q. That

would run it back to 1917 or 1918? A. It hasn't been fished out 61 feet for about 20 years. Q. Has it been fished out substantially beyond the 54 feet mark since the Carlisle trap was in? A. Oh, yes. When you were speaking of the Carlisle trap, they have had three different locations. It hasn't been fished out to 61 feet at low tide since the present Carlisle trap has been established, but it has been fished between 54 and 56 or 57 feet. It has been fished on that line but perhaps 100 or 125 feet beyond the 54 feet depth at various times. I would like it understood that 54 feet depth or 57 foot depth in any particular year would be a different point from a 54 foot point at some other season. The defendants' fishing appliances as constructed on the ground this year extends something over 400 feet beyond where it was last year, and approximately the same beyond where it was the year before. I am not exactly familiar with how far out it was the year preceding that. It is approximately today over 400 feet further than it was during the last four years.''

The gist of the testimony of respondent's witness is that respondents have not fished their location out to the sixty-one foot depth for twenty years, or since 1909; that, while the notice of location showed sixty-one feet, the respondents never fished farther than approximately fifty feet beyond the fifty-four foot depth, and then only a few years subsequent to 1899. Reference to all of the plats received in evidence shows that the length of the lead of respondents' trap was practically fourteen hundred and forty-one feet in 1909. The above drawing shows the fifty-four foot point to be practically the same distance from point C.

That respondents intended to abandon and did abandon their fishing location beyond the fifty-four foot depth shortly subsequent to 1899, is established. The facts and circumstances of the case indicate a purpose, on the part of respondents, to not fish beyond that point. We have examined the map filed by respon-

dents with its notice of new location in 1929. The plat shows a solid line from the fifty-four foot point towards deep water, with a dotted line from the fifty-four foot point inshore. This is significant. Though the plat, also, shows the sixty-one foot point, there can hardly be any other inference than that the respondents not only have not fished beyond the fifty-four foot point, but have, from the time of their original filing, treated the fifty-four foot point as the end of their location. There is no reason for the fifty-four foot point to be shown on the map, unless placed there to signify the point to which the respondents theretofore fished. We are clear that, not only in 1909, but from the time of the original filing of notice of location, respondents did not fish beyond the fifty-four foot depth. Respondents did no more than give notice of an intention to fish to that point. Their map discloses that they did not fish beyond that point, the actual survey made in 1909 is proof of the fact that, at that time, the respondents were not fishing beyond the fifty-four foot depth, and the testimony of respondents' witness tends to prove that only for a few years subsequent to 1899 was any fishing done by respondents beyond point 54 LW. It follows, as provided by Rem. Comp. Stat., § 5684:

"Should the locator or owner of any pound-net or fish-trap location fail to construct a fishing appliance thereon for four consecutive years, his location shall be deemed abandoned, even though he shall have complied in other respects with the laws pertaining thereto,"

that respondents' failure to construct a fishing appliance beyond point 54 LW, for the statutory period, constituted an abandonment of the location beyond that point. The notice and plat filed by the respondents evidenced an intention to fish the location de-

scribed. That is not enough. To maintain a continuous right to such site the licensee must maintain actual physical possession thereof. The licensee must make such improvements as the purpose for which the site is to be used requires. Actual use is a prerequisite to a continuance of the right to the location. Four years' non-user of a portion of the location described in their plat and notice, is an abandonment of that much of the original location; therefore, appellant's location when made in 1910 was valid, and *Womer v. O'Brien,* 37 Wash. 9, 79 Pac. 474, is not in point.

Respondents' application for relocation, or for the extension of their location, was an application for a new location. Not using that portion, or having been granted a license to use that part, and then losing it by non-user, presents no different situation, in principle, than if the original notice and plat filed by respondents was for a location extending to point 54 LW. In such case, the addition of new territory would transform the location into a "new location," whatever it might be named. An analogous authority is *Board of Supervisors of Bay County v. Edmunds,* 139 Mich. 466, 102 N. W. 998, holding that, if a county is changed in its territory by the addition of territory, it becomes a "new county," although the name be unchanged.

There is no merit in the contention that the short lead of appellant's trap is not a material portion of the trap. That lead, extending seven hundred and fifty-one feet to the southeast, shown on the above diagram as line 3-4, is a fixed appliance, a part of the appellant's trap, and its purpose is to lead the fish into the heart of the trap, there to be impounded. It is as much a part of the trap as the long lead shown on the drawing as 3-5. The long lead is ten hundred and

ninety-eight feet in length. The total length of the two leads is within the maximum length prescribed by the statute. It is not shown that the trap, which includes the leads and other fixed appliances for impounding the fish, was constructed contrary to the provisions of the statute. The statute does not define what constitutes a fish trap. The trap shall not exceed twenty-five hundred feet in length, and there shall be an end passageway of at least six hundred feet and a lateral passageway of at least twenty-four hundred feet between all traps and other fixed appliances.

"No lead of any pound-net or fish-trap in Puget Sound shall exceed twenty-five hundred feet in length, and there shall be an end passageway of at least six hundred feet and lateral passageway of at least twenty-four hundred feet between all pound-nets, traps and other fixed appliances. The lead of any pound-net or trap may be extended to highwater mark on the tide-lands owned by the state, or on other tide-lands with the consent of the owners thereof: *Provided,* such extension shall not exceed the length of the lead provided in this act. Should the locator or owner of any pound-net or fish-trap location fail to construct a fishing appliance thereon for four consecutive years, his location shall be deemed abandoned, even though he shall have complied in other respects with the laws pertaining thereto."

The legislature has prescribed the following method to determine the end passageways between traps:

"For the purpose of determining end passageways, base lines shall be drawn at right angles with the general course of locations first originally established and intersecting the ends thereof, and the end passageways shall be measured at right angles from such base lines: *Provided, however,* this section shall not affect any location lawfully existing under previous statutes, and any and all such fishing appliances may be maintained upon such existing locations as though this act

had not been passed, or they may be changed to conform to the provisions hereof as to end passageways at the option of the location owner and holder thereof.'' Rem. Comp. Stat., § 5685.

Respondents located their traps a number of years prior to location of appellant's trap. Respondents' location is the ''first originally established.'' Following the statutory method, we have indicated by line 10-11 on the above diagram the southerly base line, ''drawn at right angles with the general course'' of the location first originally established. Measuring the end passageway, six hundred feet in width, at right angles from that base line, we have a parallelogram, as shown by lines 10, 11, 7, and 8. It will be noted that no part of appellant's trap is within the end passageway of this parallelogram, which is six hundred feet wide and twenty-four hundred feet in length. If the respondents' trap is extended to sixty-one feet or a total of five hundred feet to the depth of sixty-five feet, it is apparent that a portion of appellant's trap (line 3-4) would be within the end passageway. To illustrate: The space between the broken line running northwesterly from point 61 LW and broken line 12-13 southerly therefrom and parallel thereto would be the end passageway of six hundred feet if respondents' location were extended to low water depth of sixty-one feet. So extended, all of the short lead of appellant's trap would be within the end passageway.

It is unnecessary to discuss *Johansen v. Mulligan,* 41 Wash. 379, 83 Pac. 417. The only question raised in that case was whether there was a lawful lateral passageway between the traps of defendant and plaintiff, which distinguishes it from the case at bar in which the question is whether there is an end passageway between the traps of respondents and appellant.

The judgment is reversed, and the cause remanded with instructions to grant to the appellant the relief for which it prays.

TOLMAN, C. J., PARKER, BEALS, and MITCHELL, JJ., concur.